IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CHARLIE M. ANDERSON, § | |
| § | |
| Plaintiff § | |
| § | |
| v. § | Civil Action No. 3:11-CV-0051-K-BH |
| § | |
| MICHAEL J. ASTRUE, § | |
| Commissioner of Social Security, § | |
| § | |
| Defendant. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed April 4, 2011 (doc. 13), and *Defendant's Motion for Summary Judgment*, filed April 22, 2011 (doc. 14). Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **DENIED**, Defendant's motion should be **GRANTED**, and the final decision of the Commissioner should be wholly **AFFIRMED**.

## I. BACKGROUND[1]

### A. Procedural History

Charlie M. Anderson ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits under Title II of the Social Security Act. On August 18, 2008, Plaintiff filed concurrent

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "R."

applications for Title II disability insurance benefits ("DIB") and for Title XVI supplementary security income ("SSI"). (R. at 80-81.) His SSI claim was awarded on July 2, 2009 (R. at 41), but his DIB claim was denied initially and upon reconsideration (R. at 82-87, 91-94). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") on his DIB claim and personally appeared and testified at a hearing held on December 19, 2009. (R. at 21, 95-96.) On March 17, 2010, the ALJ issued his decision finding Plaintiff not disabled. (R. at 8-20.) Plaintiff then requested that the Appeals Council review the ALJ's decision. (R. at 6.) On November 9, 2010, the Appeals Council denied his request for review, and the ALJ's decision became the final decision of the Commissioner. (R. at 1-3.) On January 7, 2011, Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

**B. Factual History**

    **1. Age, Education, and Work Experience**

Plaintiff was born on December 3, 1959; he was forty-six years old at the time of his disability application and fifty years old at the time of the his hearing before the ALJ. (R. at 23.) He has a high school education and past relevant work experience as a welder and painter. (R. at 24-25.)

    **2. Medical Evidence**

On January 13, 2003, Plaintiff was diagnosed with gout at the Memphis VA Medical Center ("VA"). (R. at 348.) Despite being treated with medication, he had elevated uric acid levels on November 7, 2003. (R. at 347.) On March 26, 2004, Plaintiff's primary care physician, Susan L. Brown, M.D., noted that Plaintiff had gout flares since his last visit and his uric acid levels were still elevated. (R. at 343-44.) On April 19, 2004, Plaintiff visited the VA again where he was noted to

have gout flares, pain in his knees and hands, insomnia, fatigue, and elevated uric acid levels. (R. at. 342-43.) On May 17, 2004, he returned to the VA with a "swollen hot L knee" that reportedly flared up about every two months. (R. at 337-338.) His left knee effusion was drained that day (R. at 338), and he was prescribed crutches on June 7, 2004 (R. at 347). On August 2, 2004, Michael A. Cremer, M.D., reported that Plaintiff had a clear medical history of gout despite no recent flares. (R. at 332.) Plaintiff tested positive for subjective fever, malaise, and fatigue on August 10, 2004. (R. at 330.) During a visit to the VA in November 2004, he reported malaise, fatigue, and two to three flare-ups in his knees since his last visit. (R. at 323.) On April 4, 2005, Plaintiff reported two gout attacks to the VA since his last visit. (R. at 321.) On November 16, 2005, he reported five gout exacerbations since his last visit in April. (R. at 310.)

During 2006, Plaintiff reported three gout attacks. (R. at 292, 296, 302.) On January 18, 2006, he reported experiencing a gout attack that had occurred two weeks earlier, had lasted three to four days, and had resulted in mild persistent pain in both knees. (R. at 302.) On May 31, 2006, he reported his next gout attack, stating that the attack had occurred a month and a half earlier and had lasted two days. (R. at 296.) He also reported more frequent attacks, and mild soreness in his knees, but no swelling. (*Id.*) On August 9, 2006, he reported a gout attack in his left knee from the month before that lasted three to four days, and fatigue throughout his body "x 2 months" when he was eating or working on machinery. (R. at 290, 293.) He did not report any more gout attacks until February 14, 2007, when he reported one in his knees from during the month before that lasted three to four days. (R. at 283.) He had high uric acid levels at that visit. (*Id.*)

On May 13, 2009, John Frenz, M.D., completed a consultative examination report for Plaintiff. (R. at 349-55.) Dr. Frenz's clinical diagnostic impressions at the time were arthritis and arthralgia in multiple joints, hypertension, dyslipidemia, and depression. (R. at 355.) He noted that

Plaintiff seemed to be "impeded in his overall activity capacity by moderately intense multiple arthralgias" which were "inadequately eased by ongoing treatment." (*Id.*)

William Hand, M.D., a state agency medical consultant ("SAMC"), assessed Plaintiff's Physical Residual Functional Capacity ("RFC") on November 11, 2008 and January 6, 2009. (R. at 356, 373.) In his first assessment, Dr. Hand noted that Plaintiff had normal function in his hands, full motion in his other joints, and normal examination of the spine. (R. at 356.) Noting that the only problem appeared to be in his knees, Dr. Hand asked Plaintiff to get x-rays of his knees and a radiologist's opinion on any arthritis as mild, moderate, or severe. (*Id.*) Upon reviewing the x-rays on January 6, 2009, Dr. Hand determined that they did not show any arthritis or severe orthopedic problems and assigned Plaintiff a severity rating of "Not Severe." (R. at 371-73.)

On November 11, 2008, Amy Morgan, Ph.D., completed a Psychiatric Review Technique ("PRT") form for Plaintiff and assessed his mental RFC. (R. at 357-370.) She found that Plaintiff did not have any severe impairments but did have depression. (R. at 357, 360.) As to his functional limitations, she opined that Plaintiff had no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (R. at 367.) She noted that Plaintiff was capable of cooking, household chores, driving, shopping, attending church, and handling money; appeared capable of understanding and carrying out instructions; could maintain attention and concentration adequately for two hours in an eight-hour workday; could complete a normal work week without excessive interruptions from psychological symptoms; could relate appropriately to co-workers and supervisors on a limited basis; and could adapt to a job setting. (R. at 369.)

On June 30, 2009, Susan Thompson, M.D., completed a PRT form for Plaintiff and assessed his mental RFC. (R. at 565-578, 587-590.) She found that Plaintiff had coexisting non-mental

impairments that required referral to another medical specialty, and affective disorders and anxiety-related disorders, including marked distress giving rise to recurrent and intrusive recollections of a traumatic experience. (R. at 565, 570.) With respect to his mental RFC, she noted that Plaintiff was not significantly limited in his ability to understand and remember locations, procedures, and very short and simple instructions. (R. at 587.) He was markedly limited, however, in his abilities to understand, remember, or carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public. (R. at 587-88.) Plaintiff was also "moderately limited" in his abilities to maintain attention and concentration for extended periods, set realistic goals, and make plans independently of others. (*Id*.)

That same day, John Durfor, M.D., assessed Plaintiff's physical RFC. (R. at 579-586.) He noted a primary diagnosis of arthritis and arthralgia in multiple joints with a secondary diagnosis of hypertension. (R. at 579-80.) He indicated that Plaintiff was able to occasionally lift or carry twenty pounds and frequently lift or carry ten pounds. (*Id.*) In an eight-hour work day, he was limited to less than two hours of standing or walking and about six hours of sitting. (*Id*.) He needed a hand-held assistive device for ambulation, and had unlimited ability to push or pull except for his limitations in lifting and carrying. (*Id*.)

### 3. Hearing Testimony

On December 10, 2009, Plaintiff and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 21-40.) Plaintiff was represented by a non-attorney representative. (R. at 23.)

#### a. Plaintiff's Testimony

Plaintiff testified that he was fifty years old, had a high school education, was separated, and

had no children living with him. (R. at 23-24.) He had previously worked as a painter at a steel company, where he painted steel beams laid across a table using a paint gun. (R. at 24-25.) He was diagnosed with rheumatoid arthritis in 1999 and started going to the VA in 2002. (R. at 26.) He was laid off in 2001, but didn't look for an easy job because he did not have a good education, could not read or write well, and suffered from a learning disability. (R. at 28.) He explained that he could write his name but could not read a newspaper or write a letter. (R. at 28-29.) He could not work in 2003 because his knees, elbows, and shoulders would swell. (R. at 26.)

In 2006, if he stood for fifteen minutes, his knees became swollen or sore. (R. at 29.) His knees had flare-ups with the longest one lasting three months and the rest from four to six days. (R. at 31.) To relieve the pain, he took "Endomecin, colchicine, and allopurinol" and laid down for up to two or three days. (R. at 29-30.) He also had pain is his shoulder, foot, and elbow, and problems with his arms and hands. (R. at 30, 32.) He dropped things and sometimes slipped and fell. (R. at 32.) When his hands swelled, he could feel and pick up light things, but did not have a tight grip. (R. at 34.) He lost concentration because of the pain and had trouble sitting, driving, and getting in a tub. (R. at 31.)

Plaintiff got a cane, walker, and crutches from the VA in either 2004 or 2005, and used them in 2006. (R. at 32.) He also received depression medication from the VA in 2006. (R. at 33.) He blamed his gout for his inability to work, explaining that he had always believed in work and had started picking and chopping cotton at age eight or nine. (R. at 33.) While unemployed, he thought about driving trucks but did not try it because of his knees. (R. at 31.) Plaintiff also filled out a form for the prison system but missed his appointment due to swollen knees. (*Id.*)

### b. VE's Testimony

The VE testified that Plaintiff had worked as a welder and painter, which she considered

heavy with a specific vocational preparation ("SVP") of 5. (R. at 35.) The ALJ asked the VE to opine whether an individual of Plaintiff's age, education, and work experience could perform any jobs if he was limited to light work; could sit or stand at his option; could not climb, crawl, kneel or squat; could occasionally stoop and crouch; and was limited to non-complex work. (R. at 35-36.) The VE testified that the hypothetical person could perform assembly-type jobs, "packing inspecting-type" jobs, and "machine tending" jobs that were found in significant numbers in the local and national economy. (R. at 36-37.) Upon cross-examination, the VE testified that if the hypothetical individual had frequent (one-third to two-thirds of the day) interruptions from concentration, persistence, and pace due to pain interference, or was absent from work three to four days a month, the individual would not be competitively employed. (R. at 37.)

**C.    ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on March 17, 2010. (R. at 8-20.) At step one, he determined that Plaintiff had not engaged in substantial gainful activity from his alleged onset date of January 1, 2006, through the date last insured of December 31, 2006. (R. at 13, ¶ 2.) At step two, he found that Plaintiff had the medically determinable impairments of gout and hypertension. (R. at 13, ¶ 3.) At step three, he found that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled a listed impairment. (R. at 13, ¶ 4.) In his RFC assessment, the ALJ determined that Plaintiff had the ability to perform light work, "limited by the need to sit or stand, at his option, while in the performance of the job duties, and the inability to climb, crawl, kneel or squat, and no more than occasional stooping or crouching, and non-complex duties." (R. at 13, ¶ 5.) He found that Plaintiff was unable to perform his past relevant work, but given his age, education, work experience, and RFC, could perform other jobs existing in significant numbers in the economy. (R. at 16-17, ¶¶ 6-

10.) He concluded that Plaintiff was not under a disability, as defined by the Social Security Act, at any time from January 1, 2006, the alleged onset date, through December 31, 2006, the date last insured. (R. at 17, ¶ 11.)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

#### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issues for Review**

Plaintiff presents three issues for review:

(1)     The ALJ's finding that Plaintiff does not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt P, app. 1 is unsupported by substantial evidence.

(2)     The ALJ's finding that Plaintiff does not medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 is unsupported by substantial evidence.

(3)     The ALJ had a heightened duty to develop the evidence because Anderson was unrepresented by counsel.

(Pl. Br. at 1.)

**C.      Issue One: Meeting a Listed Impairment**

In his first issue for review, Plaintiff argues that substantial evidence does not support the ALJ's finding that he did not meet one of the listed impairments in 20 C.F.R. pt. 404, Subpt. P, app. 1. (Pl. Br. at 4-12.) He contends that the ALJ improperly concluded that he did not meet Listing 14.09D regarding inflammatory arthritis and committed reversible error when he failed to offer anything in support of his conclusion at step three. (*Id.*)

      **1.      Listing 14.09D**

The listed impairments in the Social Security regulations "are descriptions of various physical and mental illnesses . . . most of which are categorized by the body system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990). "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Id*. at 530. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id*.

- 10 -

(emphasis in original). The specified medical criteria are designed to be demanding and stringent because they lead to a presumption of disability making further inquiry unnecessary. *Id.* at 532; *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994). The claimant bears the burden of proving that his impairments meet or equal the criteria found within the Listings. *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). If a claimant fails to meet this burden, the ALJ's finding is supported by substantial evidence. *Henson v. Barnhart*, 373 F. Supp. 2d. 674, 685 (E.D. Tex. 2005) (citing *Selders*, 914 F.2d at 620).

> In order to meet Listing 14.09D for inflammatory arthritis, a claimant must show:
>
> D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
>
> 2. Limitation in maintaining social functioning.
>
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. pt. 404, subpt. P, app. 1, §14.09D. "As used in these listings, 'repeated' means that the manifestations occur on an average of three times a year, or once every 4 months, each lasting 2 weeks or more; or the manifestations do not last for 2 weeks but occur substantially more frequently than three times in a year or once every 4 months; or they occur less frequently than an average of three times a year or once every 4 months but last substantially longer than 2 weeks." *Id.*, §14.00(I)(3). In addition, the manifestations must occur within the period covered by the claim. *Id*.

Here, Plaintiff failed to show that he met Listing 14.09 for two reasons. First, he has not shown that he had "repeated manifestations of inflammatory arthritis" during the relevant period of January 1, 2006 through December 31, 2006. The three gout attacks that he reported during that

time lasted only two to four days, when each one had to last two weeks or more in order to be considered "repeated manifestations." *Id.* While Plaintiff testified that he experienced a three month long flare-up of gout in 2006, there is no medical evidence to support that claim. Second, there is no medical evidence showing that he had at least two of the constitutional symptoms or signs required to meet Listing 14.09, i.e. severe fatigue, fever, malaise, or involuntary weight loss. The only constitutional symptom he reported during the relevant time period was fatigue. Since Plaintiff has failed to meet his burden of showing he met Listing 14.09D during the relevant time period, the ALJ's step three finding is supported by substantial evidence.[2]

### 2. ALJ's Error

Plaintiff correctly argues that the ALJ committed error when he failed to discuss the reasons for his adverse finding at step three. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (the ALJ commits error when he fails to discuss the evidence offered in support of a disability claim or fails to explain the basis for an unfavorable finding at step three). The analysis does not end there, however, and requires a further determination of whether the error was harmless. *See id.* (citing *Morris v. Bowen*, 864 F.2d 333, 334 (5th Cir. 1998)). An error is harmless as long as it does not affect the substantial rights of a party. *See id.* ("Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected") (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)). Here, the ALJ's error in failing to provide reasons for his step three finding was harmless because Plaintiff never met his burden of proof of meeting

---

[2] Plaintiff contends that he meets the requirements of Listing 14.09 when looking at the evidence as a whole from 2004 to 2007. (Pl. Reply at 2.) Listing 14.09 clearly states, however, that the "manifestations must occur within the period covered by the claim." 20 C.F.R. pt. 404, subpt. P, app.1, §14.00(I)(3). As discussed, Plaintiff has failed to show that the required manifestations occurred during the relevant time period.

the requirements of Listing 14.09. Because the error was harmless, remand is not required on this basis.

**D.     Issue Two: Medical Equivalence**

Plaintiff next contends that the ALJ's finding that Plaintiff does not medically equal one of the listed impairments is unsupported by substantial evidence. (Pl. Br. at 12-15.) He reasons that Social Security Ruling ("SSR") 96-6p requires the record before the ALJ to contain an SAMC's medical judgment on the issue of medical equivalence, and that no SAMC made such a judgment regarding Listing 14.09D in this case. (*Id.* at 13.) He contends that the ALJ's failure to comply with SSR 96-6p resulted in prejudice. (*Id.* at 15.)

       **1.     Requirement of SAMC Opinion**

SSR 96-6p was promulgated to clarify the role of SAMCs in the determination of disability at the initial and reconsideration phases of the administrative review process. 1996 WL 374180, at *3 (S.S.A. July 2, 1996). The ALJ or Appeals Council is responsible for deciding the ultimate legal question of whether a listing is met or equaled and is not bound by a finding from an SAMC. *Id*. However, according to longstanding policy, the judgment of an SAMC on the issue of equivalence must be received into the record as expert opinion evidence and given appropriate weight. *Id*. The signature of an SAMC on a disability determination and transmittal form or another document on which he records his findings is sufficient to ensure that he has given consideration to the question of medical equivalence. *Id*.

The SAMC in this case (Dr. Hand) considered Plaintiff's disability claim and determined that his impairments during the relevant time period were not severe. (R. at 373.) The finding of "not severe" was one of four different choices provided on the form; the form also also included the

following three choices: (1) durational denial, (2) meets listing, and (3) equals listing. Given that the form included "medical equivalence" among the four choices, the SAMC clearly considered the issue of medical equivalence in making his determination. *See e.g. Crouse v. Astrue*, 7:05-CV-113-R (N.D. Tex. 2005) (SAMC who completed and signed a form with five choices, including "equivalence," showed that the SAMC considered the issue of medical equivalence.)

Further, Dr. Hand was not required to make a specific equivalence determination because he had already concluded that Plaintiff's impairments were "not severe" and decided to terminate the disability analysis at step two of the sequential evaluation process. The assertion that he should have given an additional opinion on the subject of medical equivalence alone is too narrow a reading of what constitutes consideration of medical equivalence. The assumption underlying that assertion is that there are only two possible opinions that an SAMC could make: equivalent and not equivalent. *See id.* It does not allow for the fact that a rating of "not severe" is in itself an opinion on the issue of equivalence. Because Dr. Hand issued a "not severe" rating, the ALJ *did* have the judgment of an SAMC on the issue of equivalence in th record before him, and did not violate the longstanding policy set forth in SSR 96-6p.

### 2. Prejudice

Even if a rating of "not severe" does not constitute an opinion by an SAMC on the issue of equivalence, remand is still not required. Remand for failure to comply with a ruling is appropriate only when a complainant affirmatively demonstrates ensuant prejudice. *See Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir.1981); *Mays*, 837 F.2d at 1364. A claimant establishes prejudice by showing that adherence to the ruling might have led to a different decision. *Newton*, 209 F.3d at 458 (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). Here, Plaintiff has not shown how a specific

consideration of medical equivalence might lead to a different conclusion. In fact, because the SAMC had made a determination of "not severe" at step two, a specific consideration of medical equivalence at step three would be an exercise in futility. As stated before, a determination that a claimant is not disabled at any point in the five-step evaluation is conclusive and terminates the analysis. *Lovelace*, 813 F.2d at 58.

D.      **Issue Three: Heightened Duty**

In his third issue for review, Plaintiff contends that the ALJ had a heightened duty to develop the record because he was not represented by an attorney. (Pl. Br. at 15-16.) He argues that the ALJ breached that duty when he failed to seek an opinion from a medical expert on the issue of equivalence. (*Id.*)

Generally, a claimant bears the burden to present all evidence relevant to his claim of disability. 20 C.F.R. § 416.912(a). However, the ALJ has a duty to fully and fairly develop the facts relevant to that claim. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). This basic obligation to fully and fairly develop the record rises to a heightened duty when a social security disability claimant is not represented by counsel. *Castillo v. Barnhart*, 325 F.3d 550, 552 (5th Cir. 2003). "This duty requires the ALJ to 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Kane v. Heckler*, 731 F.2d 1216, 1219-20 (5th Cir. 1984). "The failure of the ALJ to develop an adequate record is not, however, ground for reversal per se." *Id.* at 1220. In order to obtain reversal, a claimant must show that he was prejudiced as a result of the failure. *Id.* In other words, he must show that the ALJ "could and would have adduced evidence that might have altered the result." *Carey*, 230 F.3d at 142.

Here, the ALJ had a heightened duty to develop the record because Plaintiff was represented

by a non-attorney. He was not required to seek a medical expert's opinion on the issue of medical equivalence, however, because the record *did* contain such an opinion. Even if the record did not contain such an opinion, Plaintiff has failed to show that seeking the opinion might have altered the result. *See Jones v. Barnhart*, 372 F. Supp. 2d 989, 1006 (S.D. Tex. 2005) (the ALJ should have developed the record where an updated list of medications and medical treatments revealed that the claimant was prescribed medications and received medical treatment from five physicians prior to the supplemental hearing, and her testimony at the supplemental hearing revealed that she was receiving psychiatric treatment from an institution not listed in the medical records). Because Plaintiff has failed to show that the ALJ could and would have adduced evidence that might have altered the result, remand is not required on this issue as well.

## III.  RECOMMENDATION

Plaintiff's motion for summary judgment should be **DENIED**, Defendant's motion for summary judgment should be **GRANTED**, and the decision of the Commissioner should be wholly **AFFIRMED**.

**SO RECOMMENDED**, on this 11th day of July, 2011.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

      A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE